IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO: 2:09-cr-175-MEF |
| | ) | |
| CHRISTOPHER LEE STANTON | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Before this court is a Motion to Suppress (Doc. #36), filed by Defendant Christopher Lee Stanton (Stanton), to which the government has filed a Response (Doc. #38). On February 23, 2010, this court held a hearing on the Motion. On March 4, 2010, Stanton filed a post-hearing Brief (Doc. #45). Upon consideration of the Motion, the testimony at the evidentiary hearing, and the briefs, the undersigned RECOMMENDS the motion be DENIED.

## I.   BACKGROUND

Based on the parties' briefs and testimony at the hearing held on March 2, 2010, and to a preponderance of the evidence, the court finds as follows:[1]

On August 9, 2008, Sergeant Sonny Schreiber (Sergeant Schreiber), a detective with the Troy Police Department, received information about a complaint filed with the police department regarding possible child-abuse. He was then requested by the victim, T.C., a

---

[1] The Court reaches findings of fact at a suppression hearing based on a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

minor approximately sixteen years old, and her mother, Deidra Stanton, to come to the Stanton house because they believed that video evidence of the crime was in the process of being destroyed by Stanton.

Sergeant Schreiber arrived at the Stanton home and began to talk to Deidra Stanton and T.C.  Sergeant Schreiber was informed that Deidra Stanton was Stanton's wife and T.C. is her daughter.  T.C. told the Sergeant that her step-father, Stanton, who at the time was employed as an Alabama State Trooper, had been touching her in an inappropriate manner, and the inappropriate touching had been occurring since she was approximately seven or eight years of age.  T.C. also believed that Stanton had on at least two occasions video taped her with a camera.

T.C. and her mother had confronted Stanton with the allegations after filing the police report.  According to Deidra Stanton and T.C., Stanton began packing up personal belongings and placing them in his car.  Because they were concerned that Stanton was attempting to hide or destroy evidence, they they called the police station and requested that someone be sent to the house.

Sergeant Schreiber asked all of the parties to come to the police station and they all obliged.  Stanton was placed in an interview room while Sergeant Schreiber conducted interviews with Deidra Stanton and T.C.  During her taped interview, T.C. detailed a history of sexual abuse, beyond that of inappropriate touching, that she alleged was committed by Stanton.  She also gave greater detail regarding incidents where she believed that Stanton had

recorded the abuse.  In her interview, Deidra Stanton stated that, after she had confronted Stanton with the allegations of abuse and video taping, Stanton had packed up items and placed them in his car and drove away from the house.  He was gone for a few minutes and then returned.

During these interviews, Stanton was sitting in an interview room down the hall from Deidra and T.C..  The interview room had an automatic lock on the door, such that when the door was closed, it was locked.  However, the room was equipped with a telephone that rang directly to police dispatch.  During the time that Stanton was waiting to be interviewed, Sergeant Schreiber stuck his head in Stanton's interview room on more than two occasions to inform Stanton what was going on and check on him.  At some point, Stanton was brought food and he left the interview room, at least twice, to use the restroom.

At approximately 4:55p.m., several hours after entering the interview room, Stanton was interviewed by Sergeant Schreiber.  Prior to any questioning, Stanton executed a written waiver of his *Miranda* rights.  Sergeant Schreiber, who had known Stanton for several years because of their connection in law enforcement, informed Stanton of the allegations that had been made and Stanton denied the allegations.  Stanton stated that he believed the allegations were made to divert attention from T.C.'s recent pregnancy.  Sergeant Schreiber also informed Stanton of the allegation that Stanton had left his house, in his vehicle, in order to destroy video tapes or other evidence.  Stanton admitted that he left, but claimed he had not thrown anything out. Sergeant Schreiber then asked if Stanton would consent to the search

of his car and home.  Stanton said yes.  Sergeant Schreiber confirmed that Stanton had been read his rights and that he understood his rights.  Stanton agreed.

From approximately 5:00 p.m. to just before 9:00 p.m., Sergeant Schreiber re-interviewed Deidra Stanton and performed other investigative functions.  At around 9:00p.m., upon Sergeant Schreiber's request, Stanton executed a written consent to search his residence, a written consent to search his vehicle, and a written consent to search his computers and an array of associated media.

The officers conducted a search of the home immediately upon receipt of the written consent forms.  During the search they seized some bedding, such as sheets, and comforters from T.C.'s room, because of T.C.'s allegations that she had awoken on one occasion to see Stanton standing over her, engaged in masturbation.[2]  The officers also recovered eight-millimeter tapes, most of which contained video of traffic stops performed by Stanton, having been taken from the in-dash camera of his patrol car. One of the tapes purportedly begins showing a traffic stop, but then cuts away to show what appears to be a man holding the camera and filming a pile of girl's panties, but then cuts back to traffic stops.  Sergeant Schreiber testified that he was later able to confirm that the room where the panties were filmed, as T.C.'s.  Officers also removed video tapes, computers, computer storage devices, and associated media.

From Stanton's vehicle the officers recovered another eight-millimeter tape labeled

---

[2] Bedding taken from T.C.'s room was found to contain semen, allegedly containing a DNA match to Stanton.

"my tape," which contained video of an unknown woman entering the bathroom at Stanton's home, disrobing and taking a shower.   The tape contained other videos, including one of T.C. when she was approximately three or four years of age, nude and exiting a bathroom after apparently bathing.  Officers also removed a box of compact disks (CDs).  Those CDs were later viewed by Sergeant Calista Everage (Sergeant Everage) of the Troy Police Department.

After viewing the CDs, Sergeant Everage showed some of the images to Sergeant Schreiber because she believed that some of the images on the disks were child pornography. Sergeant Schreiber agreed and called Special Agent Margaret Faulkner (Agent Faulkner) with the FBI, knowing that she was involved in a task force specializing in child pornography cases.

On approximately August 21, 2008, Agent Faulkner arrived at the Troy Police Department and viewed some of the images contained on the CDs.  She identified images of child pornography on the CDs, which she recognized as children from other cases on which she had worked.  Agent Faulkner took the evidence from the Troy Police Department on August 25th, 2008, and continued her investigation, finding numerous images of child pornography.  Based on her findings, she applied for a federal search warrant, which was signed by the Honorable Charles Coody, Magistrate Judge, United States District Court for the Middle District of Alabama, on September 18, 2008.

Agent Faulkner then shipped the items to Mobile, Alabama, and they were then

forwarded to a laboratory.  The search and investigation of the contents of the computer and associated media was completed in April of 2009.  A report generated from the laboratory revealed that multiple images and videos of child pornography were found on the seized items.  The present charges stem from these findings.

## II.   DISCUSSION

Stanton presents two issues for this court's consideration: (1) whether his consent was sufficiently valid to support the search that was conducted; and (2) whether the federal search warrant was valid.  The court will address each of these issues in turn.

### A.   Consent

Stanton claims that valid consent was not given in this case because: (1) he "was illegally locked in a cell[3] at the Troy Police Department for at least seven hours;" (2) "[a]t the time he was illegally detained he was never informed that he would be so detained or that he could not revoke the consent;" and (3) "the consent was vague, overly broad and did not particularize what was actually authorized to be seized or recovered."  Motion (Doc. #36) at 1.

#### 1.   Locked in the interview room

The court must determine what, if any, effect the fact that Stanton was locked in an interview room for several hours might have on whether his consent was valid.  Although not expressly stated, Stanton is challenging the voluntariness of his consent.

---

[3] The uncontested testimony at the hearing was that Stanton was held in an interview room, not a cell.

It is axiomatic that police officers lacking probable cause for a search warrant may still conduct a search pursuant to a voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances. *Hudson v. Hall*, 231 F.3d 1289, 1296 (11th Cir. 2000) ("In considering whether a consent to search was voluntary, we examine the totality of the circumstances."); *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989). "In evaluating the totality of the circumstances underlying consent, the court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." *United States v. Simms*, 385 F.3d 1347, 1355 (11th Cir. 2004).

The facts in this case do not support Stanton's contention that consent was not voluntary. While it is true that Stanton was in a locked room when he gave his consent and had been there for several hours, it was just a standard interview room with an automatic lock. However, Stanton was not under arrest at that time and would have been free to leave and to deny consent, should he have chosen to do so. As a state trooper, this is certainly a fact Stanton would have known and something to which he attested when he executed his Miranda waiver. *See* Exhibit 1. Further, Sergeant Schreiber testified credibly that the room contained a phone, that he repeatedly checked on Stanton when he was in the interview room,

and that either he or Sergeant Everage would have heard Stanton knocking on the door if he wanted to get out.  In addition, Stanton testified that he left the room on at least two occasions and was brought something to eat.

Stanton demonstrated a great willingness to cooperate with police.  He agreed to go to the police station, agreed to be interviewed, and agreed to execute a waiver of rights. There is nothing in the record to suggest anything but a willingness to cooperate. There is no evidence of coercive police action. There is no evidence Stanton lacked the education or intelligence to reach any decision to consent.  Stanton was a trained  Alabama State Trooper and was fully aware of his rights.  His willingness to consent suggests a belief that no incriminating evidence might be found.  Accordingly, the court finds that Stanton voluntarily consented to the search.

### 2.  *Never informed that he was detained and could revoke consent*

Stanton's only argument that he was never informed that he was detained is simply the statement that "[a]t the time he was illegally detained he was never informed that he would be so detained."  Motion (Doc. #38) at 1.  As the court stated above, Stanton was not detained, and certainly not illegally detained, at the time he gave consent to search.  He was voluntarily at the police station and voluntarily gave consent.

Further, Stanton's contention that he was not informed that he could revoke his consent is without merit.  The last two lines of the consent forms he executed to search his car and residence read: "I give this consent of my own free will and no threats or promises

8

have been made to induce me to give my consent. I understand that I can stop this search at any time." Exhibits 3(a) & (b).  In addition, in his interview with Sergeant Schreiber, Stanton stated that he would give his consent to search, and he reiterated that he knew and understood his rights.  *See* Exhibit 2.

At the hearing, Stanton argued that he was denied the ability to withdraw his consent by being locked in a secluded room while the search took place at his residence. However, in supplemental briefing,  Defendant points this court to *Mason v. Pulliam*, 557 F.2d 426 (5th Cir. 1977), and concedes that "the defendant's later revocation of the consent would have been futile, void and of no force or effect. The evidence already seized could not then be taken back by the defendant nor was it due to be returned by the police as they were not legally obligated to return lawfully seized evidence." Def's Reply (Doc. #45) at 2. Therefore, this claim is due to be denied.

### 3.    *Consent was vague, broad, and not particularized*

Stanton argues that his consent was vague, broad, and not particularized.  However, as the government notes, the law does not require any such particularity.  Instead, "[w]hen an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless. Rather it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass."  *United States v. Street,* 472 F.3d 1298, 1308 (11th Cir. 2006) (quoting *United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir.2006).  Specifically, Stanton argues that his consent: (1) did not

authorize police to view the contents of two compact disks (CDs) taken from his vehicle; and (2) was only given to Sergeant Schreiber, not the FBI, and had expired by the time FBI Agent Faulkner viewed the CDs.

### a. Viewing the CDs

During the search of Stanton's vehicle, the police seized two CDs. As stated above, because Stanton's consent was made without express limitations, the search was constrained by the bounds of reasonableness. *Id.* Thus, the court must determine if the viewing of the CDs after their seizure was unreasonable.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The exchange in this case included Stanton's execution of a consent form that allowed the police to "take from [his] vehicle any letters, papers, materials or other property which they may desire." In addition, Sergeant Schreiber had informed Stanton of the fact that they were in search of videotapes. *See* Exhibit 2. Further, Stanton executed a consent to allow the officers to seize his computers and any media or memory, which allowed the officers to view and copy digital media. *See* Exhibit 3(c). Thus, Stanton was aware of the types of items the officers were seeking and it was certainly within the bounds of reasonableness for the officers to view the contents of the CDs, just as it would be reasonable for the officers to have seized and then read the words contained on any letters

or papers.  The court finds that it was within the bounds of reasonableness for the officers to view the contents of the CDs.

    **b.**    **Consent given only to Sergeant Schreiber and the viewing of the CDs by Agent Faulkner twelve days later**

Here, Stanton argues that his consent was given strictly to Sergeant Schreiber and not to Agent Faulkner and that his consent had expired by the time she viewed the contents of the CDs, some twelve days later.  The government argues that Stanton lacks standing to challenge Agent Faulkner's search for any reason, because he had abandoned any expectation of privacy in the CDs.  The court takes Stanton's challenge here as a challenge to the scope of the search.  That is: Stanton argues that the viewing of the CDs by Agent Faulkner twelve days after they were seized was not within the reasonable bounds of the given consent.

The consent form executed by Stanton, in which he gives consent to Sergeant Schreiber to search his vehicle, states "[t]hese officers are authorized by me to take from my vehicle any letters, papers, materials or other property which they may require." Exhibit 3(b). Therefore, the consent allowed officers to search and seize, and placed no limits on the duration of the seizure.

The court does not find that the terms of the consent limited the search and seizure to Sergeant Schreiber.  The language specifically allows the search and seizure to take place by multiple officers.   By any measure of reasonableness, that when Stanton executed the consents to search his car, home, and computers, he knew Sergeant Schreiber would not be executing it alone.  During the interview, Sergeant Schreiber asked if Stanton would "give

11

*us* permission to search" the car and house.  Exhibit 2.

Again, it was within the bounds of reasonableness for the officers to operate as though the consent to search included all personnel needed to perform the search.  This analysis also applies to the viewing of the images by Agent Faulkner twelve days later.  Stanton knew that the officers were searching for videos, DVDs, and computer related media because he signed a consent form allowing them to take such items from his house.

Agent Faulkner was asked to view the CDs because the police officers saw what they believed to be child pornography images on the CDs.  She was able to identify the images as known child pornography.  The fact that the officers might seek help from other law enforcement agencies is a fact which Stanton would have been personally aware, and it was reasonable.  The fact that they might turn the evidence over to another agency once they saw evidence of a crime is also reasonable and would be expected.

The fact that the Agent's viewing took place twelve days later was also reasonable. In the consent to search and seize his computer related media Stanton allows the officers to remove the items from his house in order to image any media and do a complete analysis. *See* Exhibit 3(c).  Stanton knew the items being sought by the officers and knew that it would take a period of time to sort through and search the items.  Stanton evidenced his understanding of the length of his consent by not asking for the items to be returned.  The court does not find that the passing of twelve days prior to the viewing of the CDs by Agent Faulkner to be  outside the bounds of reasonableness.

**B.     The Search Warrant**

Stanton raises three specific claims as to the search warrant in this case.  First, he argues that the search warrant was too general and not particularized.  Second, he claims that the warrant lacked sufficient probable cause for its issuance.   Third, he argues that government agents flagrantly disregarded the terms and scope of the warrant.  The court will address each challenge in turn.

### 1.     *Sufficient Particularity*

"The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one particularly describing the place to be searched and the persons or things to be seized. The manifest purpose of this particularity requirement was to prevent general searches."  *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (internal quotations omitted).  Stanton argues that the search warrant lacked time limits and specific descriptions of the records to be seized, leaving too much discretion to the agents.  Motion (Doc. #36) at 6-7.  He also states "[s]earch warrants do not permit officers to '. . . search for evidence of other crimes but only to search for and seize evidence relevant . . .' to the facts contained in the affidavit." *Id*. at 7.  (quoting *United States v. Andresen*, 427 U.S. 463, 481-482 (1976)). Stanton then concedes that the affidavit contains sufficient particularity, but that it was not properly incorporated into the warrant by reference and physically attached to the warrant. Motion (Doc. #36) at 9-10.

However, a review of the warrant reveals that the Magistrate Judge specified a time

period of ten days, that the affidavit was expressly made a part of warrant, and it was

attached. *See United States v. Pratt*, 438 F.3d 1264, 1269 n.8 (11th Cir. 2006) ("Search

warrants can incorporate by reference the words of supporting documents if the documents

are attached to the warrant."). Further, a review of the warrant confirms that the incorporated

affidavit contains sufficient particularity, because it states in relevant part as follows:

> (1) A Compaq Presario, SR-1000, Serial Number MXP432056L
> and A Compaq Presario, Serial Number MXP4320578,
> including any computer, computer system and related
> peripherals, data processing devices and software (including but
> not limited to central processing units; internal and peripheral
> storage devices such as fixed disks, external hard drives, floppy
> disk drives and diskettes, routers, computer compact disks, CD-
> ROMS, DVD, and other memory storage devices); peripheral
> input/output devices (including but not limited to keyboards,
> printer, video display monitors, scanners, digital cameras, and
> related communications devices such as cables and
> connections), as well as any devices, mechanisms, or parts that
> can be used to restrict access to computer hardware (including
> but not limited to physical keys and locks).
>
> (2) All visual depictions... of child pornography or minors
> engaged in sexually explicit conduct, as defined in Title 18,
> United States Code, Section 2256.
>
> (3) Any and all computer passwords and other data security
> devices designed to restrict access to or hide computer software,
> documentation, or data.
>
> (4) Any and all documents, records, emails, and internet history
> (in electronic form) pertaining to the possession, receipt or
> distribution of child pornography or visual depictions of minors
> engaged in sexually explicit conduct, as defined in Title 18,
> United States Code, Section 2256, or pertaining to an interest in
> child pornography whether transmitted or received.
>
> (5) Any and all records, documents, invoices, notes and
> materials (in electronic form) that pertain to accounts with any

14

Internet Service Provider, as well as any and all records relating
to the ownership or use of computers.

Exhibit 4. The affidavit describes the types of files that are being sought, the violations of
each specific law, and even includes a description of the methodology of the search.
Accordingly, the court finds that the warrant meets the particularity requirement.

### 2.   *Sufficient Probable Cause*

A court will find "probable cause exists to support a search warrant when the totality
of the circumstances indicates that there is a fair probability of discovering contraband."
*United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008). Probable cause "is a fluid
concept - turning on the assessment of probabilities in particular factual contexts." *United
States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). "A magistrate's determination
of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates,*
462 U.S. 213, 236 (1983) (internal quotation omitted).

The court has reviewed the affidavit and has determined that there was a reasonable
basis for the issuing Magistrate Judge to determine that probable cause existed. Stanton's
contention here is that the affidavit contained "foundationless expert testimony" that was
nothing more than "'rambling boilerplate recitations' which neither addressed the facts of the
defendant's case nor gave any specific conclusions about the facts or the defendant." Motion
(Doc. #36) at 11.

The court disagrees. The affidavit contains detailed and sometimes graphic facts

concerning this case and specific conclusions related to the facts and the defendant.  This court is satisfied that in viewing the totality of the circumstances, the Magistrate Judge had "a substantial basis . . . for concluding that probable cause existed."  *Gates*, 462 U.S. at 238-39 (internal quotation omitted).

### 3.   *The Scope of the Warrant*

Stanton argues that the agents exceeded the scope of the warrant by conducting a widespread seizure of items not contemplated by the warrant.  However, Stanton does not specify which items were so seized, and no evidence was put on to suggest the search exceeded the scope of the warrant.

Next, Stanton argues that the items were seized in excess of the ten-day time limitation of Rule 41 of the Federal Rule of Criminal Procedure.  The government argues that Stanton's consent waives any expectation of privacy in the items, or that the ten-day limitation applied to the seizure of the computer, or the imaging of their contents.  Further, the government contends that a violation of the ten-day rule would not lead to exclusion because: "(1) there was [no] prejudice in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, [and] (2) there is [no] evidence of intentional and deliberate disregard of a provision in the Rule."  Gov.'s Brief (Doc. #38) at 21.

The court is concerned that there was a violation of the Rule in this case.  This does not appear to be a case where the contents of the computers and other media were "imaged"

16

within ten days.  Although the government's brief mentions court decisions relating to imaging, it does not assert that the contents of the seized items were imaged.  Further, the court has reviewed the testimony presented at the hearing and neither the officers nor the agents testified that the items were imaged prior to being sent to the laboratory.

The government points the court to cases where courts have held that  "[n]either Fed. R. Crim. P. 41 nor the Fourth Amendment provides for a specific time limit in which a computer may undergo a government forensic examination after it has been seized pursuant to a search warrant."  *United States v. Hernandez*, 183 F. Supp. 2d 468, 480 (D. P. R. 2002). Indeed, this Circuit has recognized that "[t]he Fourth Amendment does not specify that search warrants contain expiration dates."  *United States v. Gerber*, 994 F.2d 1556, 1559 (11th Cir.1993).  Thus, Stanton does not raise a constitutional violation, but rather a violation of the Rules.[4]

This leads the court to the question of whether suppression is appropriate if a violation of Rule 41 has occurred.  "[U]nless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression of evidence only where (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule

---

[4]  The court notes that Rule 41 has been modified to state:

> "A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review."

had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *United States v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983) (quoting and adopting the standard in *United States v. Stefanson*, 648 F.2d 1231 (9th Cir.1981)). As stated above, there has been no clear constitutional violation. Further, Stanton is unable to show prejudice.[5] At the time the ten days had passed, child pornography had been found on the CDs that were taken from his car. Thus, the search would have occurred. Further, Stanton had consented to the imaging of his computers and never requested their return. Therefore, he is unable to show that the search would have been less abrasive, because once the search of the computers and other media had occurred the images would have been found.

Finally, there is no evidence that the officers acted with intentional and deliberate disregard of the Rule. This is especially true where several courts around the country have determined that Rule 41 applies to the seizure of computers. In addition, as the government argues, the return of the search warrant indicates that its execution took place on the same day the Magistrate Judge signed the warrant, which is the day Agent Faulkner testified that she boxed up the items and readied them for shipping. Even the language of the Affidavit indicates the Agent's intentions, where she informs the court that simply the sorting of the data recovered from the computers and storage devices to determine whether the information

---

[5] Stanton does not allege prejudice, and as he admits in his Reply brief, "[t]he evidence already seized could not then be taken back by the defendant nor was it due to be returned by the police as they were not legally obligated to return lawfully seized evidence." Def's Reply (Doc. #45) at 2.

is of the kind included in the scope of the warrant "can take days or weeks." Exhibit 4 at 10.

The better course of action by the agents would have been to image the computers and associated media within the ten-day time period. However, the court cannot say that the agents acted in flagrant disregard of the terms of the warrant. And, "absent a 'flagrant disregard' of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized." *United States v. Khanani*, 502 F.3d 1281, 1289 (11th Cir. 2007).

Accordingly, the court need not determine whether a violation of Rule 41 occurred, because, even assuming such a violation, suppression would not be appropriate.

## III.   CONCLUSION

Accordingly, for the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that the Motion to Suppress (Doc. #36) be DENIED. It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation **on or before May 14, 2010**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District

Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 30th day of April, 2010.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE